IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:11-CV-41-D

| | | |
|---|---|---|
| CROP PRODUCTION SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| THOMAS ORMOND, SR., ORMOND FARMS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Crop Production Services, Inc. ("plaintiff" or "CPS") sued Ormond Farms and its four partners ("defendants" or "Ormond") for breach of contract under various contractual legal theories [D.E. 1, 4, 26]. Defendants counterclaimed against CPS, seeking to transform a straightforward contract case into a far-reaching tort case [D.E. 30]. CPS seeks to dismiss some of defendants' non-contractual counterclaims for failure to state claims upon which relief can be granted [D.E. 35]. As explained below, the court grants plaintiff's motion to dismiss and dismisses defendants' counterclaims for tortiuous interference with contract, unfair and deceptive trade practices, treble damages, negligence, and negligent misrepresentation.

I.

Ormond Farms (the "Farm") is a general partnership that operates various farmlands in eastern North Carolina. See 2d Countercl. [D.E. 30] ¶ 2. The partnership is comprised of four partners: Thomas Ormond, Sr., Gloria W. Ormond, Thomas B. Ormond, Jr., and Sheila B. Ormond (collectively, the "partners"). Id. In 2010, the Farm raised cotton, corn, and soybeans, and purchased all of its needed seed, chemicals, and fertilizer from Crop Production Services ("plaintiff" or "CPS"). Id. ¶¶ 8, 9. The Farm also hired CPS to provide agronomic services, such

as soil sampling, crop protection application, field management, and prescription of crop protection chemicals. See id. ¶¶ 12–13.

The Farm entered into a credit agreement with CPS that permitted the Farm to receive materials and agronomic services from CPS via a credit account. See Am. Compl. [D.E. 26] ¶¶ 7, 7(a), Ex. A. As security for the credit account, the Farm and the partners executed a promissory note for $2,500,000 due on February 5, 2011, and a security agreement giving CPS a lien on the Farm's crops and equipment. See id. ¶¶ 20–21, 23–25, Exs. B–E. In addition, the partners each signed a surety agreement guaranteeing the Farm's payment of all obligations to CPS. Id. ¶¶ 27–28, 30–31, 33–34, 36–37, Ex. F.

As part of the Farm's arrangement with CPS, the Farm paid for a "scouting" service, in which CPS employees monitored the Farm's crop fields to identify potential weed and pest problems and recommend appropriate crop protection chemicals. See 2d Countercl. ¶¶ 14, 17, 18. After the Farm planted crops in April 2010, two CPS scouts, Hank Cherry, Jr. ("Cherry"), and Jurden Braxton Bell, III ("Bell"), started monitoring the Farm's fields. Id. ¶ 18.

Cherry monitored the Farm's cotton fields, which consisted of approximately 5,000 acres of cotton situated in the middle of crop fields owned by other farms. Id. ¶ 20. In May 2010 and again in June 2010, Cherry recommended that the Farm aerially apply a mixture of crop protection chemicals to its cotton fields. See id. ¶¶ 21–22. The recommended mixtures were comprised mostly of chemicals that CPS manufactured and distributed. See id. ¶¶ 23–32. The Farm hired an experienced crop duster to aerially apply the CPS mixtures. Id. ¶¶ 33–34. The crop duster voiced concern about applying the mixture aerially to the Farm's cotton, because the cotton was adjacent to crop fields owned by other farms. Id. ¶ 35. The Farm contacted Cherry, who reassured it that the mixture contained an "anti-drift chemical" that would prevent any problems. Id. ¶ 36. The crop duster applied the mixture to the Farm's cotton, and within a week the Farm received calls from the owners of the adjacent crop fields complaining that the mixture had damaged their crops. Id. ¶¶

2

37–38. Multiple sources verified that ceratin chemicals in the CPS mixture drifted onto the adjacent fields and damaged the crops. See id. ¶¶ 39–41. The Farm settled with the owners of the adjacent fields by purchasing their damaged crops for $735,000. Id. ¶ 42.

In September 2010, when the Farm began to harvest its cotton, the average yield was 300 pounds-per-acre. Id. ¶¶ 43–44. The Farm harvested an average of 950 pounds-per-acre from cotton fields not sprayed with the CPS mixtures. Id. ¶ 45. A cotton field owned by a nearby farm that did not use the mixture yielded over 1,000 pounds-per-acre. Id. ¶ 46.

Bell monitored the Farm's soybean fields. See id. ¶¶ 47–48. Based on Bell's having identified certain weeds in the soybean fields, CPS recommended the application of a herbicide that it distributed. Id. ¶¶ 48–49. Within days of spraying the herbicide, the soybean plants diminished to half their original size. Id. ¶ 50. The Farm notified CPS of the herbicide's effect on the soybean plants, and a CPS employee informed the Farm that the herbicide suppressed the growth of soybeans. Id. ¶ 51. The CPS employee recommended a fertilizer to counteract the effect of the herbicide, and the Farm followed the employee's advice. Id. Nevertheless, when the Farm harvested its soybeans, fields sprayed with the herbicide yielded 14 bushels-per-acre, and fields not sprayed with the herbicide yielded over 50 bushels-per-acre. Id. ¶ 52.

In March 2011, the Farm informed a CPS credit officer that, due to the damage the recommended chemicals had caused to the cotton and soybean crops, the Farm was unable to pay for the chemicals. Id. ¶ 53. CPS gave the Farm three options: (1) pay the entire amount immediately; (2) sign a release of liability for the 2010 crop year, pay $1,750,000 immediately, and pay the remaining balance over five years with 9% interest (secured by a lien on the next five years' harvest); or (3) prepare for litigation. Id. ¶ 57. The Farm was not willing or able to pay CPS the amount and was not willing to release CPS from liability for the crop damage. Id. ¶ 58.

On March 23, 2001, CPS sued the Farm and the partners (collectively, "defendants") to collect the Farm's outstanding payments and enforce the various surety agreements between CPS

3

and defendants. See id. ¶ 59; Compl. [D.E. 4] ¶¶ 1–37. As a result of the lawsuit, the Farm's banking institution refused to renew the Farm's line of credit. 2d Countercl. ¶ 59. The Farm, however, was able to find alternative financing. Id. ¶ 60. The Farm then "discovered that [it was] unable to purchase supplies [it] needed from many of [its] regular suppliers because representatives from CPS had informed these creditors and suppliers [that] there would be consequences if they furnished [credit or supplies to the Farm]." Id. ¶ 60. In addition, "CPS made it known to vendors of products distributed by CPS that none of those products were to be sold to the [Farm]," and "[s]everal of these vendors and suppliers refused to sell CPS products to the [Farm] . . . as direct result of CPS'[s] actions." Id. ¶ 61–62.

On June 20, 2011, defendants filed an answer, alleged counterclaims against CPS, and alleged third-party claims against various CPS employees [D.E. 15]. CPS amended its complaint on July 20, 2011 [D.E. 26]. On August 3, 2011, defendants filed an answer to CPS's amended complaint, alleged counterclaims against CPS, and alleged third-party claims against the CPS employees. See 2d Countercl.

Defendants assert eight counterclaims against CPS: (1) negligence, id. ¶¶ 63–71; (2) breach of express warranty, id. ¶¶ 72–76; (3) breach of implied warranty of fitness for particular purpose, id. ¶¶ 77–83; (4) negligent misrepresentation, id. ¶¶ 84–90; (5) breach of fiduciary duty, id. ¶¶ 91–97; (6) tortious interference with a prospective economic advantage, id. ¶¶ 98–102; (7) breach of implied covenant of good faith and fair dealing, id. ¶¶ 103–12; and (8) unfair and deceptive trade practices, id. ¶¶ 113–17. In addition, defendants asserted two third-party claims against four CPS employees: (1) negligence, id. ¶¶ 128–36; and (2) negligent misrepresentation, id. ¶¶ 137–43.

On August 29, 2011, CPS and the CPS employees moved to dismiss four of defendants' counterclaims, defendants' request for punitive damages, and defendants' third-party claims against the CPS employees, due to a failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) [D.E. 35]. On September 29, 2011, defendants voluntarily dismissed their third-party

4

claims against the CPS employees [D.E. 37]. On October 19, 2011, defendants filed a response in opposition to CPS's motion to dismiss [D.E. 41]. On November 11, 2011, CPS replied to defendants' response [D.E. 42].

II.

North Carolina substantive law controls defendants' state-law counterclaims. The standard for a motion to dismiss under Rule 12(b)(6), however, is a procedural matter controlled by federal law. See, e.g., Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007); Wilson v. Dryvit Sys., Inc., 206 F. Supp. 2d 749, 752 (E.D.N.C. 2002), aff'd, 71 F. App'x 960 (4th Cir. 2003) (per curiam) (unpublished). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); see Fed. R. Civ. P. 12(b)(6); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57 (2007); Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam); Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc). A court accepts all factual allegations in the complaint as true. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). A court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc., 551 U.S. at 322. A court need not accept, however, the complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see also Iqbal, 129 S. Ct. at 1949–50. Similarly, a court is not bound accept as true "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (quotation omitted); see Iqbal, 129 S. Ct. at 1949–50.

CPS moves to dismiss the following counterclaims: (1) tortious interference with a prospective economic advantage; (2) unfair and deceptive trade practices; (3) request for punitive

5

damages; and (4) negligence and negligent misrepresentation. CPS Mot. Dismiss Countercl. [D.E. 35] 2. The court examines each counterclaim seriatim.

A.

CPS argues that defendants' counterclaim for tortious interference with a prospective economic advantage fails because defendants have not alleged sufficient facts to show a prospective contract and because defendants did not allege actual damages. See CPS Mem. Supp. Mot. Dismiss Countercl. [D.E. 35-1] 7–9.

In North Carolina, the "'interfere[nce] with a man's business, trade or occupation by maliciously inducing a person not to enter a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues.'" Dalton v. Camp, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001) (quoting Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)) (alternation in original). A party alleging tortious interference must show the existence of a prospective contract with which the tortfeasor interfered. See, e.g., Dalton, 353 N.C. at 654, 548 S.E.2d at 710; Coleman v. Whisnant, 225 N.C. 494, 506–07, 35 S.E.2d 647, 655–56 (1945). A prospective contract exists when there is a reasonable expectation that the third party otherwise would have entered into the contract. See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc., 330 N.C. 666, 680–81, 412 S.E.2d 636, 644–45 (1992); accord Dalton, 353 N.C. at 653, 548 S.E.2d at 710; Coleman, 225 N.C. at 506, 35 S.E.2d at 656. For example, in Owens, the Supreme Court of North Carolina held that the plaintiff provided sufficient evidence of a prospective contract when "[p]laintiff's forecast of evidence show[ed] that he had a valid business relationship with several schools and factories in the Granite Falls area, and that he had a reasonable expectation of continuing to do business with these customers." 330 N.C. at 680, 412 S.E.2d at 644–45. Likewise, in Coleman, the Supreme Court of North Carolina held that a prospective contract existed when the plaintiff's allegations showed that, over the course of two years, the defendant had undermined the plaintiff's attempts to license a patented idea to various

6

mills, form a partnership with another mill, and contract for the manufacturing of plaintiff's patented idea. 225 N.C. at 506, 35 S.E.2d at 656.

In contrast, in Spartan Equipment, the Supreme Court of North Carolina held that the plaintiff-corporation could not proceed with its claim of tortious interference with a prospective economic advantage when the plaintiff did "not allege[] that its prospective sale to [a third party] would have been consummated but for the malicious interference of [the defendant]." 263 N.C. at 559, 140 S.E.2d at 11. Similarly, in Dalton, the Supreme Court of North Carolina affirmed summary judgment for a defendant when the evidence showed that the plaintiff's contract negotiations with a third party had broken down after a disagreement of terms—"such circumstances fail[ed] to demonstrate that a . . . contract would have ensued." 353 N.C. at 655, 548 S.E.2d at 710.

Defendants' sparse factual allegations do not show that it was plausible that the Farm had a reasonable expectation of entering into a contract with a third party. First, defendants allege that the Farm "discovered that [it was] unable to purchase supplies [it] needed from many of [its] regular suppliers because representatives from CPS had informed these creditors and suppliers [that] there would be consequences if they furnished [credit or supplies to the Farm]." 2d Countercl. ¶ 60. Defendants do not explicitly assert that they expected to purchase supplies from their "regular suppliers." See Spartan Equip. Co., 263 N.C. at 559, 140 S.E.2d at 11. Moreover, defendants do not provide supporting factual allegations, such as the nature and length of their relationship with these suppliers, or even the suppliers' names and locations. See Owens, 330 N.C. at 680, 412 S.E.2d at 644–45. Although defendants' allegations make the existence of a prospective contract possible, such fact-empty allegations fall short of making it plausible. See Iqbal, 129 S. Ct. at 1949–50; Twombly, 550 U.S. at 556–57.

Second, defendants allege that "CPS made it known to vendors of products distributed by CPS that none of those products were to be sold to the [Farm]," and that "[s]everal of these vendors and suppliers refused to sell CPS products to the [Farm] . . . as direct result of CPS'[s] actions." 2d

7

Countercl. ¶¶ 61–62. These allegations fail for the same reason: defendants do not allege the existence of a prospective contract and fail to provide adequate factual allegations to support the inference that a prospective contract existed. In addition, CPS notes that these "vendors" were likely "CPS locations," CPS Mem. Supp. Mot. Dismiss Countercl. 8, not third parties. See, e.g., Dalton, 353 N.C. at 654, 548 S.E.2d at 709 (requiring interference with "a contract with a third person" (quotation omitted)).

Third, defendants contend that the Farm's bank refused to renew the Farm's line of credit. 2d Countercl. ¶ 59. However, defendants do not allege that the bank's refusal was due to CPS's malicious interference, see Coleman, 225 N.C. at 506, 35 S.E.2d at 656, but rather because of the "lawsuit and the potential ramifications." 2d Countercl. ¶ 59.

In sum, defendants fail to plausibly allege that the Farm had a prospective contract with which CPS maliciously interfered. See Spartan Equip. Co., 263 N.C. at 559, 140 S.E.2d at 11. Accordingly, the court dismisses defendants' tortiuous interference counterclaim.

B.

Next, CPS seeks to dismiss defendants' claim for a violation of the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen Stat. § 75-1.1. In support, CPS argues that defendants did not allege any "substantial aggravating circumstances" or damages. CPS Mem. Supp. Mot. Dismiss Countercl. 9–14.

To state a claim under the UDTPA, a party must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to the party or to the party's business. See, e.g., N.C. Gen. Stat. § 75-1.1; Dalton, 353 N.C. at 656, 548 S.E.2d at 711. A practice is unfair if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 61, 418 S.E.2d 694, 700 (1992) (quotation omitted). It is deceptive if it "has the capacity or tendency to deceive." Id. at 61, 418 S.E.2d at 700. Whether a practice is unfair or deceptive under the UDTPA is a question

8

of law for the court. See, e.g., Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 534 (4th Cir. 1989); Dalton, 353 N.C. at 656, 548 S.E.2d at 711; Tucker v. Blvd. at Piper Glen LLC, 150 N.C. App. 150, 153, 564 S.E.2d 248, 250 (2002).

"North Carolina courts have repeatedly held that a mere breach of contract, even if intentional," does not rise to the level of being an unfair or deceptive trade practice. Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (quotations omitted); see, e.g., Mitchell v. Linville, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001); Branch Banking & Trust Co., 107 N.C. App. at 62, 418 S.E.2d at 700. Rather, a party must allege some type of egregious or aggravating circumstances accompanying a contract breach. See Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998); see also Bartolomeo, 889 F.2d 530, 534–36; Kelly v. Georgia-Pacific LLC, 671 F. Supp. 2d 785, 799 (E.D.N.C. 2009); PCS Phosphate Co. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 717–18 (E.D.N.C. 2007), aff'd, 559 F.3d 212 (4th Cir. 2009).

Defendants allege that CPS committed "deceptive or negligent" conduct by negligently misrepresenting and concealing material facts regarding crop protection products. 2d Countercl. ¶ 117(c); see id. ¶¶ 64–70 (asserting that CPS owed defendants a contractual duty to provide the Farm with proper advice and products). These allegations, however, support only a claim for breach of contract. Defendants believe that CPS gave poor advice, and are therefore dissatisfied with CPS's performance of its contractual obligations. A promisee's dissatisfaction with a promisor's performance of its contractual obligations does not constitute substantial aggravating circumstances. See, e.g., Mitchell, 148 N.C. App. 74–78, 557 S.E.2d 623–25 (rejecting a UDTPA claim regarding homebuilder's construction deficiencies because homebuyers' allegations did not "elevat[e] [the hombebuilder's] actions beyond breach of contract or warranty."); Kelly, 671 F. Supp. 2d at 799 (dismissing plaintiff's UTDPA claim because allegations that defendant's product was defective "did not rise to substantial aggravating circumstances"); Terry's Floor Fashions, Inc. v. Georgia-Pacific

9

Corp., No. 5:97-CV-683-BR(2), 1998 WL 1107771, at *9–10 (E.D.N.C. July 23, 1998) (unpublished) (dismissing plaintiff's UDTPA claim because allegations of "defendant's deliberate misrepresentation of the traits and qualities" of a product were not "substantial aggravating circumstances" (quotation omitted)). Thus, the court dismisses defendants' UDTPA counterclaim concerning CPS's alleged "deceptive or negligent" conduct because defendants "fail[ed] to allege any acts beyond that of a breach of contract." Branch Banking & Trust Co., 107 N.C. App. at 62, 418 S.E.2d at 700. Likewise, to the extent that defendants rely on CPS's alleged tortiuous interference with a prospective contract, 2d Countercl. ¶¶ 116, 117(d), to assert an unfair and deceptive trade practices counterclaim, that counterclaim also fails and is dismissed.

C.

Originally, CPS sought to dismiss defendants' claim for punitive damages. See CPS Mem. Supp. Mot. Dismiss Countercl. 15–16. Defendants responded that they are not seeking punitive damages, but rather treble damages pursuant to N.C. Gen. Stat. § 75-16. See Defs.' Resp. CPS Mot. Dismiss. Countercl. 8. Because the court has dismissed defendants' UDTPA counterclaim, defendants' claim for treble damages is dismissed as moot.

D.

Finally, CPS argues that North Carolina's economic loss rule bars defendants' counterclaims for negligence and negligent misrepresentation. See CPS Mem. Supp. Mot. Dismiss Countercl. 16–24. North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the risk. See, e.g., Kelly, 671 F. Supp. 2d at 791; N.C. State Ports State Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 328 S.E.2d 274 (1985); Land v. Tall House Bldg. Co., 165 N.C. App. 880, 882–85, 602 S.E.2d 1, 3–4 (2004); Moore v. Coachmen Indus., Inc., 129 N.C. App. 389, 401–02, 499 S.E.2d 772, 780 (1998); Warfield v. Hicks, 91 N.C. App. 1, 9–10, 370 S.E.2d

10

689, 694 (1988). The economic loss rule precludes a tort action "against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." Spillman v. Am. Homes of Mocksville, Inc., 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992).

The rationale for the rule is that it confines parties to the contract's terms when seeking redress concerning the subject matter of the contract. See Kelly, 671 F. Supp. 2d at 791–92. The rule recognizes that parties to a contract generally do not become each others fiduciaries. See Broussard, 155 F.3d at 347 ("'parties to a contract do not thereby become each others' fiduciaries; [therefore,] they generally owe no special duty to one another beyond the terms of the contract.'" (quoting Branch Banking & Trust Co., 107 N.C. App. at 61, 418 S.E.2d at 699)). Likewise, the rule prevents a party from seeking an extra-contractual tort remedy in an attempt to avoid a contract's allocation of risk. See Moore, 129 N.C. App. 389, 401–02, 499 S.E.2d 772, 780 (1998); see also Reece v. Homette Corp.,110 N.C. App. 462, 466, 429 S.E.2d 768, 770 (1993). When injury occurs to the subject matter of a contract, "[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties . . . ." Spillman, 108 N.C. App. at 65, 422 S.E.2d 742. For a party to pursue a tort claim stemming from a contract, a plaintiff "must allege a duty owed him by [a] defendant separate and distinct from any duty owed under a contract." Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F. Supp. 350, 362 (W.D.N.C.1997) (quotation omitted); see Kelly, 671 F. Supp. 2d at 791–96.

Defendants claim that CPS was negligent in describing and recommending CPS crop protection products, 2d Countercl. ¶¶ 63–71, resulting in damages to the Farm's crops and crops owned by neighboring farm. Id. ¶¶ 37–38, 43–46, 50, 52, 71. Defendants, however, contracted with CPS to recommend and provide appropriate crop protection products. See id. ¶¶ 8–9, 12–13. Defendants' tort counterclaims, therefore, are based solely on CPS's negligence in performing its

11

duties under the contract. Defendants do not allege any duties owed by CPS that are "separate and distinct" from the terms of the contract. Vanwyk Textile Sys., B.V., 994 F. Supp. at 362. Consequently, the economic loss rule bars defendants' counterclaims for negligence and negligent misrepresentation. See Kelly, 671 F. Supp. 2d at 796; accord Maynard Co-op. Co. v. Zeneca, Inc., 143 F.3d 1099, 1100–03 (8th Cir. 1998) (economic loss rule barred farmer's tort claims against defendant who recommended crop chemical that did not perform as described); Bailey Farms, Inc. v. NOR-AM Chem. Co., 27 F.3d 188, 190–92 (6th Cir. 1994) (economic loss rule barred farmer's tort claims against defendant who recommended fumigant that damaged crops).

III.

As explained above, the court GRANTS plaintiff's motion to dismiss [D.E. 35] and DISMISSES defendants' counterclaims for tortiuous interference with contract, unfair and deceptive trade practices, treble damages, negligence, and negligent misrepresentation.

SO ORDERED. This 18 day of January 2012.

JAMES C. DEVER III
Chief United States District Judge